UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| WILLIAM T. JENKINS, | ) |
| Plaintiff, | ) ) ) |
| vs. | ) ) Case No. 1:09-cv-01099-TWP-DML ) |
| CITY OF LAWRENCE, LAWRENCE POLICE DEPARTMENT, PAUL RICKETTS, LAWRENCE MAYOR, Individually and/or in his official capacity as Mayor of the City of Lawrence, AND OFFICER SHAWN ROMERIL, Individually | ) ) ) ) ) ) ) |
| Defendants. | ) |

**ENTRY ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

This case comes before the Court on Defendants' - City of Lawrence ("City"), Lawrence Police Department, Paul Ricketts, individually and in his official capacity as Mayor of the City of Lawrence and Officer Shawn Romeril ("Officer Romeril or Defendant ") (collectively "Defendants") - Motion for Summary Judgment (Dkt. 36). Plaintiff William T. Jenkins ("Plaintiff" or "Jenkins") filed suit in this Court alleging deprivation of rights guaranteed by the Fourth and Fourteenth Amendments, 42 U.S.C. § 1983 and the common law of the state of Indiana, stemming from alleged excessive use of force by police officer Romeril. Defendants' deny these allegations and seek resolution of Jenkins' claim through the entry of summary judgment. For the reasons explained below, Defendants' Motion for Summary Judgment (Dkt. 36) is **GRANTED** in its entirety.

# I. LEGAL STANDARD

Rule 56(c) of the Federal Rules of Civil Procedure governs summary judgment. Under 56(c), summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986). As articulated by the Supreme Court, "summary judgment is not a disfavored procedural shortcut, but rather an integral part of the federal rules as a whole." *Id.* at 327. In ruling on a motion for summary judgment, the admissible evidence presented by non-movant must be believed and all reasonable inferences must be drawn in their favor. *Zerante v. DeLuca*, 555 F. 3d 582, 584 (7th Cir. 2009).

The party moving for summary judgment bears the initial burden of informing the district court of the basis for its motion. *Celotex*, 477 U.S. at 323. When the moving party produces proper support of its motion, the burden then shifts to the non-movant. It is not enough for the non-movant merely to raise factual arguments that cast "some metaphysical doubt as to the material facts." *Baker v. Elmood*, 940 F. 2d 1013 (quoting *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)). A party who bears the burden of proof on a particular issue … must "*affirmatively demonstrate*, through specific factual allegations, that there is a genuine issue of material fact that requires trial." *Hemsworth v. Quotesmith.com, Inc.*, 476 F.3d 487, 490 (7th Cir. 2007).

# II. PRELIMINARY MATTERS

In Count II of Plaintiff's Amended Complaint (Dkt. 25), Jenkins has brought suit against Ricketts, the Mayor of the city of Lawrence, in his individual and official capacities and the Lawrence Police Department. Plaintiff, however, has presented no evidence relating to Ricketts

and the City of Lawrence and through his Response to this Motion, Plaintiff has agreed that he is unable to gather sufficient evidence to show that the Lawrence Police Department had a policy, practice or custom with regard to tasering and thus, those claims are abandoned. Accordingly, summary judgment is **GRANTED** in favor of defendant Ricketts and defendant Lawrence Police Department. Facts and argument related to these claims have been excluded from consideration.

### III. STATEMENT OF MATERIAL FACTS AND CLAIMS

The parties submitted a videotaped record of the incident from the time Jenkins was engaged with the two security officers until after he was arrested (Dkt. 38 Exh. 5). The video, taken by Plaintiff's friend Christopher Norman, accurately depicts the events of September 9, 2007. The Court has viewed the said videotape prior to rendering this ruling. Although Plaintiff did not dispute the majority of material facts given by Defendants, where dispute occurred, the facts and all inferences to be drawn therefrom, will be presented in the light most favorable to the Plaintiff, the nonmoving party. *See Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 150-51 (2000).

During the evening hours of September 9, 2007, gunshots were heard by Indianapolis Metropolitan Police Department ("IMPD") officers near the address of 9400 Stouffer Court, which is located within an apartment complex. Individuals were seen running from the area. IMPD officers secured five individuals at gunpoint but another suspect remained at-large. Shortly thereafter, Officer Romeril of the Lawrence Police Department ("LPD") was dispatched to the scene to assist the IMPD officers.

While the five individuals were handcuffed and on the ground, IMPD Officer Ferguson and LPD Officer Romeril observed Jenkins speaking loudly to two apartment complex security officers in the courtyard of the complex. The security guards instructed Jenkins to leave the

courtyard area, which ran between the apartments, and go inside his home.[1] Jenkins refused. Jenkins admits that during the time he was speaking to the security guards, he got mad and raised his voice. When Officers Ferguson and Romeril came up to the security officers and Jenkins, Jenkins was still refusing to obey the demands to go inside his home. Jenkins had never met or had any encounters with Officer Romeril prior to September 9, 2007.

Upon the officers' arrival, Jenkins was now facing five people, the two security guards who were already engaged with Jenkins, Officers Ferguson and Romeril, and a plain clothes officer, Officer Torres. At the time of the incident, Plaintiff had been diagnosed with antisocial personality disorder, schizophrenia and bi-polar disorder and was actively taking the medication Seroquel. One of the side effects of Seroquel is slurred speech. Officer Ferguson noticed a strong odor of alcohol on Plaintiff's breath as well as blood shot eyes and slurred speech. Romeril also smelled a strong odor of alcohol on Plaintiff's breath.

Officer Ferguson then instructed Jenkins to go inside his residence. Jenkins refused and told Officer Ferguson that he did not have to leave because he was on private property. Officer Ferguson explained to Jenkins that the search for the remaining suspect in the earlier gunfire incident was ongoing and that Jenkins needed to vacate the courtyard area. Jenkins again refused to leave the courtyard, to go inside his apartment. Jenkins was ultimately told several times by Officer Ferguson to vacate the area and go back to his home. Jenkins refused each of these demands. Jenkins friends, a male voice and a female voice on the video, can be heard attempting to coax Jenkins to obey the officers' command and to go into his residence or at least onto his porch.

---

[1] At some point during the conversation with the two security guards, the video reveals that Jenkins lifted his shirt and turned around, as if to show that he was unarmed.

The conversation between Officer Ferguson and Jenkins lasted approximately ninety seconds. Officer Ferguson then attempted to reach out to grab Jenkins' left arm. Jenkins stepped back and away from Officer Ferguson and began walking backwards with his arms outstretched parallel to the ground. From there a third party female, Tonita Toney ("Toney"), holding an infant in her arms, approached and became involved in the incident. Officer Romeril grabbed Jenkins' shirt and began to pull him to the left while Toney and the infant were removed. During this time the video indicates that Jenkins allowed his weight and body to shift in the direction he was being pulled.

For the majority of the time Jenkins was standing, his hands were behind his back. It was not until Toney reached to move the arm of the Officer which was holding Jenkins, that his arms became free and movement from Jenkins took place. While Officers Ferguson, Romeril, and Torres were attempting to place Plaintiff into custody, Officer Romeril tasered Jenkins. Plaintiff does not know how many times he was tasered by Officer Romeril. Officer Romeril tasered Jenkins two (2) times.[2] The first taser deployment lasted four (4) seconds and the second taser deployment lasted two (2) seconds. Thereafter, Jenkins was placed into handcuffs. Jenkins was not tasered while in handcuffs. Jenkins was ultimately arrested and charged with the following offenses: a violation of I.C. 35-44-3-3 – Resisting Law Enforcement, I.C. 7.1-5-1-3 – Public Intoxication and I.C.35-45-1-3 – Disorderly Conduct. The allegations against Jenkins were ultimately dismissed as a result of the State's untimely reinstatement of charges.

At the time of the incident, Officer Romeril was certified in taser usage and had attended and passed the prescribed TASER International user course. This user course covered all aspects

---

[2] On September 21, 2007, Deputy Chief of the LPD, Gary Woodruff generated a Taser usage report for the taser belonging to Officer Romeril. Every activation of an LPD taser is recorded by the taser's on-board CPU. Taser usage reports cannot be manipulated by the taser user or the person downloading the data.

of taser usage including nomenclature, operation, liability, policy, deployment considerations, practical exercises and a written test. At the time of the incident, Lawrence Police Department General Order 5.02 – Continuum of Force, as well as Lawrence Police Department General Order 4.20 – Less Lethal Review Board Policy, were in existence.

On September 9, 2007, the LPD had a policy in place to investigate both the circumstances surrounding the use of a taser as well as claims of excessive force. Pursuant to General Order 5.02 Use of Force, when an Officer uses his Taser, the officer's supervisor will investigate the circumstances surrounding the deployment and complete a Special Report. The officer using the Taser will complete a Taser Use Report. The Special Report and the Taser Use Report along with the case report are forwarded to the Operations Captain. Once reviewed by the Operations Captain the reports go to the Administrative Captain for review. In the event a complaint was received about the use of a Taser implying excessive force, the Deputy Chief's Office would assign the investigation of the complaint to either an Administrative Inquiry or an Internal Investigation. The Deputy Chief determined which course of action he felt was necessary. If the Administrative Inquiry discovered wrong doing the investigation would be forwarded to Internal Affairs for further work. The LPD Policy was followed with regard to investigating the complaint by Tonita Toney.

On September 12, 2007, Plaintiff's girlfriend, Toney, filed a Complaint concerning the events of September 9, 2007. LPD policy was followed with respect to her Complaint. Officer Romeril's supervisor, Lt. Stan Stephens, responded to the location of the Incident and conducted the initial investigation which is documented in a Special Supervisory Report and a Supervisory Taser Report. An additional Administrative Review of the Incident was conducted by Cathy Troutt, serving in the position of Operations Commander. Per LPD's policy, Operations

Commander Cathy Troutt also conducted a comprehensive investigation into the claims made by Toney including speaking with all the Officers involved in the Incident and documented each Officer's statements, including three LPD officers and two IMPD officers.

## IV. DISCUSSION

### A. Section 1983 Claims Against Romeril

Section 1983 does not provide substantive rights; rather it provides "a method for vindicating federal rights elsewhere conferred by those parts of the United States Constitution and federal statutes that it describes." *City of Monterrey v. Del Monte Dunes at Monterrey, Ltd.*, 526 U.S. 687, 749 n. 9 (1999); *Graham v. Connor*, 490 U.S. 386, 293-94 (1989). To prevail on § 1983 claim, a plaintiff must show that "(1) the defendant deprived the plaintiff of a right secured by the Constitution and laws of the United States, and (2) the defendant acted under color of state law." *J.H. Exrel. Higgin v. Johnson*, 346 F.3d 788, 791 (7th Cir. 2003) (citation omitted).

### B. Qualified Immunity

Because the Court agrees with Defendants' argument that even if Plaintiff stated a colorable violation of the Fourth Amendment in his Complaint, Defendants are entitled to qualified immunity, the Court will begin with its consideration. "The doctrine of qualified immunity shields from liability public officials who perform discretionary duties." *Chelios v. Heavener*, 520 F.3d 678, 691 (7th Cir. 2008); *see also Belcher v. Norton,* 497 F.3d 742, 749 (7th Cir. 2007). "The qualified immunity defense provides ample room for mistaken judgments and protects all but the <u>plainly incompetent and those who knowingly violate the law</u>." *Id*. (emphasis added and internal quotations and citations omitted); *see also Clash v. Beatty,* 77 F.3d 1045, 1048 (7th Cir. 1996) (noting, in the excessive force context, that the "police cannot have the

specter of a § 1983 suit hanging over their heads when they are confronted with a dangerous fugitive, possible escapee, or as long as their behavior <u>falls within reasonable limits</u>.").

Although qualified immunity is an affirmative defense, the burden of defeating an assertion of qualified immunity rests with the plaintiff. *Clash v. Beatty,* 77 F.3d 1045, 1047–48 (7th Cir. 1996). In order for Plaintiffs to defeat a qualified immunity defense, "(1) the complaint must adequately allege facts that, if true, would constitute a violation of a constitutional right, and (2) the case law must be clearly established at the time of the alleged violation, so that a reasonable public official would have known that his conduct was unlawful." *Kiddy-Brown v. Blagojevich*, 408 F.3d 346, 353 (7th Cir. 2005) (internal quotations omitted). The Supreme Court recently decided that while this sequence set forth is often appropriate, it is not mandatory. *Pearson v. Callahan,* 555 U.S. 223 (2009). Therefore, district courts may exercise their discretion in deciding which of the two prongs to address first. *Id.* As the case law provides, both the consideration of excessive force and probable cause fall under the purview of qualified immunity and under both consideration, and Defendants' conduct is not so patently unreasonable as to fall outside of its protection.

1. *Excessive Force*

Jenkins comes before this Court arguing a § 1983 claim against Officer Romeril based on an alleged Fourth Amendment violation stemming from "excessive force" used during the September 9, 2007 arrest. The Supreme Court has found that the Fourth Amendment's freedom from unreasonable searches and seizures encompasses the plain right to be free from the use of excessive force in the course of an arrest. *Graham v. Connor,* 490 U.S. 386, 394-95 (1989) (all claims that law enforcement officers have used excessive force in the course of an arrest,

investigatory stop, or other seizure are analyzed under the Fourth Amendment and its "reasonableness" standard).

The right to make an arrest necessarily carries with it the right to some degree of physical coercion to effect it. *Sow v. Fortville Police Dept.,* 636 F.3d 293, 304 (7th Cir. 2011); *Graham,* 490 U.S. at 396. "Law enforcement is a difficult job, as police officers are often forced to make split-second judgments-in circumstances that are tense, uncertain, and rapidly evolving." *Sow v. Fortville Police Dept.,* 636 F.3d 293, 303 (7th Cir. 2011) (internal quotations and citations omitted). "Therefore, the "reasonableness" of the use of force is judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id*.; *Graham,* 490 U.S. at 396. "Not every push or shove … violates the Fourth Amendment." *Sow*, 636 F.3d at 304 (quoting *Johnson v. Glick,* 481 F.2d 1028, 1033 (2d Cir. 1973)).

"The force used to effect an arrest must be objectively "reasonable" under the Fourth Amendment." *Chelios v. Heavener*, 520 F.3d 678, 689 (7th Cir. 2008). "To determine whether the force used to effect an arrest was reasonable the courts must engage in a careful balanc [ing] of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Id.* (internal quotations and citations omitted) (quoting *Tennessee v. Garner,* 471 U.S. 1, 8 (1985)). "Proper application of this balancing test requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Chelios*, 520 F.3d at 689 (internal quotations and citations omitted) (citing *Bell v. Wolfish,* 441 U.S. 520, 559 (1979)).

The Court has carefully examined and reviewed the facts and circumstances of the September 9, 2007 arrest. Through the video and testimony of the parties, it cannot be reasonably disputed that Jenkins was gesturing animatedly, continuously refused to go inside his residence, appeared upset, and spoke loudly. These facts, however, must be tempered by the fact that 1) at several points over the course of the encounter, Jenkins can be seen directing third parties away from the conversation with the officers, 2) Jenkins was alone and not in a chaotic group when refusing the police officers' and security guards' requests, and 3) at no time before the arrest did Jenkins appear to threaten, either by his words or movements the officers or security guards.

The tide, however, began to turn when Officer Ferguson stepped forward in an attempt to gain custody over Jenkins and Jenkins stepped backward. It is Jenkins' testimony that he did not step backwards to move away from the officer, but rather moved back because Toney was "grabbing" him and that he was not told he was being placed under arrest. Although the Court must view the disputed facts in the light most favorable to Jenkins, the video is in direct conflict with plaintiffs' contention. The video clearly depicts Jenkins stepping away from the officer before Toney reached him and stepping back in response to Officer Ferguson's forward movement. Defendants' contend that by stepping away, Jenkins began resisting arrest. The Court is persuaded. Pulling away, jerking away, or making it impossible for an Officer to grab one's hands has been sufficient to maintain a conviction for resisting law enforcement. *J.S. v. State*, 843 N.E.2d 1013, 1017 (Ind. Ct. App. 2006). Jenkins was plainly doing at least one of the three.

While argument may exist that Officer Romeril's action were not prudent, nor the best course of action or even necessary, these are not the proper considerations. The Court must determine whether under the totality of circumstance, Officer Romeril knew the use of a taser to subdue Jenkins would deprive Jenkins of a constitutional right. The Court finds that the facts

before it do not reasonably support that conclusion. Here, the undisputed facts of this case fall within the "hazy border between excessive and acceptable force," *Saucier v. Katz*, 533 U.S. 194, 206 (overruled on other grounds), and do not clearly demonstrate that the Defendants' conduct was so "patently violative" of the constitutional right that reasonable officials would know without guidance from a court. *Estate of Escobedo v. Bender*, 600 F.3d 770, 780 (7th Cir. 2010). As such, it is precisely the type of case in which qualified immunity should be applied to protect the officers from liability. The controlled, finite use of the taser to quickly effectuate Jenkins arrest and prevent an escalating incident could not reasonably be found to be knowingly in violation the law as is required to abrogate qualified immunity.

### 2. *Probable Cause*

The Court further finds that sufficient probable cause existed to arrest Jenkins for public intoxication, and in turn warrant summary judgment under qualified immunity. Jenkins states through deposition testimony that he had not been drinking on September 09, 2007. However, even viewing this testimony in the light most favorable to Jenkins, this is immaterial. Probable cause does not require that the crime has *actually* been committed; it means only that there are "facts and circumstances within the officer's knowledge that are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense." *U.S. v. Slone*, 636 F.3d 845, 849 (7th Cir. 2011). Officers are entitled to qualified immunity, even if mistaken, if "a reasonable officer in their position could mistakenly have believed that probable cause existed." *Jones v. Clark,* 630 F.3d 677, 684 (7th Cir. 2011).

Under the facts before the Court, not only did Jenkins refuse to comply with the requests of the officers to go inside of his residence, but both Officer Romeril and Officer Ferguson

11

testified that they smelled a strong odor of alcohol on Jenkins' breath. Further, Officer Ferguson testified that Jenkins had "blood shot eyes and *slurred speech*." It is undisputed that at the time of the incident, Jenkins had recently taken medicine a side effect of which was slurred speech. Taken together, these facts support the finding that a reasonable officer could mistakenly have believed that probable cause existed for an arrest for Public Intoxication, under I.C. 7.1-5-1-3. Accordingly, qualified immunity bars recovery on the basis of lack of probable cause.

## V. CONCLUSION

For the aforementioned reasons, Defendants' Motion for Summary Judgment (Dkt. 36) is **GRANTED** in its entirety.

SO ORDERED.

Date: 07/07/2011

Hon. Tanya Walton Pratt, Judge
United States District Court
Southern District of Indiana

Distribution to:

Robert M. Kelso
KIGHTLINGER & GRAY
rkelso@k-glaw.com

Adam Lenkowsky
ROBERTS & BISHOP
alenkowsky@roberts-bishop.com

Andrew D. Schrier
ROBERTS AND BISHOP
aschrier@roberts-bishop.com

Michael Wroblewski
KIGHTLINGER & GRAY
mwroblewski@k-glaw.com